## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, **Mark A. Waldvogel**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation, and have been since May 1998.  As part of my duties as a Special Agent with FBI, I routinely investigate criminal violations relating to bank robbery, in violation of 18 U.S.C. § 2113(a) and 2113(d).  In addition, I have received training in the area of bank robbery, and I have several years of experience with computer based crimes and investigations were computers, cellular telephones and other electronic storage devises are involved. I am currently investigating Randell L. Wicks, Jr. ("WICKS") for bank robbery, in violation of 18 U.S.C. § 2113(a) and 2113(d).  There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations, and will lead to further evidence of WICKS's involvement and the identification of individuals who are engaged in the commission of the offense.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is all electronic data located within a vehicles Telematic system, event data recorder (E.D.R.), and in car entertainment system and/or any other module of similar nature, which may include, vehicle event data, location data commonly referred to as GPS, and device connections (data from devices that have been synched with the vehicle) via Bluetooth or USB cable, located within a 2016 Chevrolet Malibu 4 door sedan vehicle identification number (VIN) 1G1ZE5ST7GF290041, hereinafter the "Device." The vehicle and Device are currently located at a secure impound lot at 239 West Mosel Avenue, Kalamazoo, Michigan, under the control of McDonald Towing, on behalf of the Kalamazoo County Sheriff's Department.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. Randell L. Wicks, Jr. ("WICKS") is a 22 year old black male. WICKS' criminal history includes bank robbery, misdemeanor assault, misdemeanor drugs, misdemeanor assaulting and resisting, misdemeanor fraud, and misdemeanor receiving stolen property.

7. On August 27, 2019, the Omni Community Credit Union in Kalamazoo, Michigan was robbed. On September 12, 2019, the Chemical Bank in Kalamazoo, Michigan was robbed. The deposits of both banking institutions are federally insured.

8. WICKS pled guilty to robbing the Chemical Bank on September 12, 2019, and admitted to driving a Chevrolet Malibu in that robbery. As explained below, WICKS robbed the

Chemical Bank with at least two other individuals. Evidence in the investigation indicates that WICKS used the same Malibu in traveling to and from a location near the Omni Community Credit Union on the day of its robbery. I expect that the location information from the Device identified below will confirm the proximity of the Malibu to both banks during the robberies, alert investigators to any other locations the Malibu traveled on the day of both robberies, and alert investigators to any other devices used by WICKS or others in the course of the bank robberies.

### Initiation of Investigation: Omni Community Credit Union Robbery

9. On August 27, 2019, at approximately 10:33 AM, a black male entered the Omni Community Credit Union located at 1609 Cork Street, Kalamazoo, Michigan, and robbed the credit union. The credit union robber brandished a silver revolver and pointed the revolver directly at the victim tellers while demanding cash. The credit union robber fired a round into the teller counter. The credit union robber then grabbed a victim teller by the hair and forced her to the vault demanding that she open the vault. The teller could not enter the code to the vault door so the credit union robber grabbed the other victim teller by the hair and forced her to the vault room door. The credit union robber fired a second round into the vault room wall just in front of the victim tellers. The second teller was not able to enter the code and access the vault either. After stealing approximately $2,503 in United States Currency (U.S.C), the credit union robber then fled the credit union on foot across Cork Street to the Southeast. A canine (K-9) dog handler tracked the credit union robber from the bank but lost the trail in the vicinity of Konkle and Miles Streets in Kalamazoo.

10. Base on a compilation of video surveillance and witness statements, the Omni Community credit union robber was described as being a black male, approximately 6' feet tall, with a slender build, 20 to 30 years old, wearing a black Nike hooded jacket, a black and red mask covering his face, black pants and black gloves. Based on the description of the robber from witnesses, the video surveillance, and the GPS location information for WICKS' Malibu prior to the robbery, investigators suspect that WICKS robbed the credit union. The revolver was silver in color with a long barrel. To date, no one has been charged with this robbery.

### **WICKS Robbs Chemical Bank**

11. On January 3, 2020, WICKS pled guilty to robbing the Chemical Bank located at 6080 West Main Street, Kalamazoo, Michigan on September 19, 2019. As described below, WICKS robbed the bank with at least two other individuals. The identity of those individuals is unknown. WICKS informed the Court during his change of plea hearing that he did not enter the bank, but participated in the robbery as the driver.

12. On September 12, 2019, at approximately 4:55 PM, two black males entered the Chemical Bank located at 6080 West Main Street, Kalamazoo, Michigan, and robbed the bank. The first bank robber to enter the bank brandished a black semiautomatic handgun and pointed it at the victim tellers while demanding cash. The second bank robber through the door took a Nike gym bag out from under his clothing and went from one victim teller to another victim teller collecting the money. The armed bank robber then pointed his handgun at the second victim teller and the acting branch manager who was sitting in the office at the time. After taking approximately $13,836 in U.S.C, the bank

robbers fled to the Northwest into a residential area. A canine (K-9) dog handler tracked the robbers from the bank through a residential area Northwest of the bank but lost the trail in the vicinity of the Meijer Store.

13. The first bank robber to enter Chemical bank was a black male, approximately 5'8 to 5'10", with a skinny build, approximately 160 to 180 lbs., 18 to 22 years old, wearing a black hooded sweatshirt, black baggy pants, and a blue fleece like material covering his face. The bank robber was armed with a semiautomatic handgun described as a Glock 9mm.

14. The second robber to enter the bank was a black male, similar height and weight as the first bank robber, wearing a black hooded jacket and a white mask with some kind of markings on it over his face. The bag he was carrying and put all of the money in was a black Nike gym bag.

15. Investigation by the Kalamazoo County Sheriff's Department (KCSD) identified a suspicious vehicle in the neighborhood just to the North of the bank prior to the robbery. A witness told deputies that a Chevrolet four-door had turned around at the dead end of the witness' street and parked in front of her house facing to the East. Two individuals got out of the vehicle, one from the front passenger's side and one from the rear seat of the car. The witness said there was a driver in the car who stayed in the car. The witness could not describe the driver. The witness described the individuals as wearing black pants and black hooded jackets or sweatshirts with the hoods over their heads and something covering their mouths. The witness said they ran to the South along the side of the house and then jumped the fence behind the house.

16. The witness said one of the individuals returned several minutes later by jumping over the fence and then stopped at the end of the street for a moment before returning to the front passenger seat of the car.  The witness said the car drove off and headed to the North on Bunkerhill Drive.  The witness photographed the car as one of the two individuals returned to the car and it drove off.  The witness did not see the second individual return to the car.

17. KCSD was able to record and preserve the images.  Using the images deputies were able to identify a Michigan license plate of ECU 6825.  The license plate was registered to WICKS on a 2016 Chevrolet Malibu.  Also identified on the vehicle was a dealer sticker from Car City.

### GPS Records for the Malibu

18. Deputies contacted Car City who confirmed that WICKS had leased a 2016 Chevrolet Malibu on July 29, 2019.  Car City told the deputies that upon the lease of the vehicle Car City installed an aftermarket Global Positioning System (GPS) on the vehicle because WICKS had poor or no credit and was determined to be a risk for failure to meet the financial obligation. While the Car City GPS data did show real time positioning, it was explained to investigators that the "ping" or location information was only collected by Car City at random intervals.

19. Deputies obtained a search warrant for Car City and Orbit leasing records to include historical and real time positioning data for the GPS installed on the Malibu.

20. The GPS installed on the Malibu did not "ping" during the August 27, 2019, Omni Community Credit Union robbery; however, it did "ping" 12 minutes prior to the robbery. Data analysis showed the Malibu stationary at approximately 10:21 AM on August 27, 2019, in the vicinity of Kingston Avenue in Kalamazoo, Michigan. This is approximately two blocks to the Southeast from the Omni Community Credit Union that was robbed the same day at approximately 10:33 AM.

21. Evidence in the investigation indicates the Omni Community Credit Union robber ran from the credit union across the parking lot on the east side of the Madeira Apartments. The Madeira apartments are located to the Southeast of the credit union and to the northwest of the Malibu's location at 1761 Kingston.



22. The GPS installed on the Malibu did not "ping" during the September 12, 2019, robbery of the Chemical Bank. A review of the records from Orbit leasing showed two "pings" on September 12, 2019, at 3:20:13 AM, and 9:34:07 AM. The Chemical Bank robbery took place several hours later at approximately 4:55 PM that day.

**September 17, 2019, Search Warrant Execution**

23. Using the GPS records provided by Car City and a conducting surveillance in the Malibu's most frequented location, investigators located the Malibu in the vicinity of 2805 Redwood Avenue, Kalamazoo, Michigan. Investigators learned from the leasing office that WICKS was renting apartment C17 at that address.

24. The Kalamazoo Valley Enforcement Team (KVET) was able to establish a surveillance on WICKS on September 17, 2020. KVET observed WICKS as the only driver of the Malibu as he made several stops throughout the surveillance.

25. Based on this information, a Kalamazoo County Magistrate Judge issued a State Warrant to search the apartment where WICKS was residing and the Malibu leased to him. Deputies, Officers and Special Agents from the Kalamazoo Resident Agency (KARA) executed the search warrant on September 17, 2019, at 2805 Redwood Avenue apartment C17, Kalamazoo, Michigan. At the time of the search warrant, the Malibu was parked in-front of the search location, unoccupied and running. During the search, agents and detectives recovered a stolen semiautomatic handgun and approximately $3858.00 U.S.C. Of the money recovered four (4) $20.00 bills' serial numbers matched serial numbers from the Chemical bank money record. Three (3) of the recorded bills were recovered from inside the apartment and one (1) bill was recovered from inside the Malibu. Investigators also located paperwork from Omni Community Credit Union located at 1609 East Cork Street, Kalamazoo, Michigan, dated August 15, 2019, that showed WICKS opening an account. WICKS' cellular telephone was located in the center console of the vehicle.

26. Detectives were able to obtain surveillance video from Omni Community Credit Union from August 15, 2019. A review of the footages shows a black male wearing a white t-shirt and dark shorts entering the credit union at approximately 3:53 PM which is consistent with the date and time on the Omni Community Credit Union paperwork recovered from the Malibu. The customer arrived at the credit union driving a dark colored Chevrolet sedan, consistent with the body style of a Malibu. The customer spends time at the teller counter until an employee takes the customer into an office.

27. At the time of the search warrant, investigators located and detained WICKS for his own safety and that of the officers. Subsequent to the search and the recovery of the stolen firearm, investigators arrested WICKS for possession of a stolen firearm.

## Interview of WICKS

28. After arresting WICKS, detectives advised WICKS of his rights and he agreed to speak. Detectives asked WICKS if he or his car was near Omni Community Credit Union on August 27, 2019. WICKS stated in summary that he was not exactly sure where the credit union was located. Detectives reminded WICKS that he opened a bank account there a few weeks earlier. WICKS then stated in summary that he recalled the bank. WICKS then continually said no, he didn't know, or he could not recall when asked about whether his car would have been in the area of the credit union. An interviewing detective also asked WICKS about the Madeira Apartments. WICKS could not recall having any friends who live near the Madeira Apartments. WICKS denied robbing Omni Community Credit Union. WICKS denied that he or his car were around Chemical Bank

on September 12, 2019, and then later stated in summary that he could not remember what he was doing on that day.

### Search Warrant for iPhone

29. A Michigan state magistrate issued a search warrant for an iPhone owned and subscribed to WICKS ("WICKS iPhone").  Law enforcement executed that search warrant on October 1, 2019.  The phone number associated with WICKS iPhone is 269-267-3207.

30. A review of the forensic report of the search warrant for WICKS iPhone revealed the following iMessage from September 11, 2019 (the day before the Chemical Bank robbery).  The participant "MJ Wicks" is 269-267-3207 (WICKS' iPhone).

    | MJ Wicks: | Today the day |
    |---|---|
    | MJ Wicks: | Wtw |
    | Zay: | I ain't even trying to do that bro.  That's out of my profession.  I'm all down For B&Es and poking mfs |
    | MJ Wicks: | Can I use them thangs N pay you after |
    | MJ Wicks: | N Ight but keep this between us bro |

31. A review of the forensic report of the search warrant for WICKS iPhone revealed that the WICKS iPhone connected via Bluetooth to Chevy MyLink, which is consistent with a Chevrolet Infotainment system.  Information from the Device would either confirm or disprove the interaction with WICKS' iPhone.

32. Your affiant obtained telephone conversations from the Newago County Sheriff's Department jail.  The calls are made by WICKS and are made to various individual to include his mother, father, and sister.

10

33. During several of the conversations with his family, WICKS discusses getting his car back from the police. WICKS doesn't say that there is anything in the car, he just makes it clear that he wants the car back.

34. The Device is currently in the lawful possession of the Kalamazoo County Sheriff's Department (KCSD). It is physically located at 239 West Mosel Avenue, Kalamazoo, Michigan, a secure impound lot under the control of McDonald Towing, on behalf of the KCSD. It came into the KCSD's possession in the following way: During the execution of a State search warrant, your affiant recovered a stolen handgun under the driver's seat of the Malibu. Another FBI agent recovered a recorded twenty dollar bait bill taken during the Chemical bank robbery on September 12, 2019 from the Malibu. The KCSD seized the vehicle as evidence of the crime of unlawful carrying a concealed weapon. Therefore, while the KCSD might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

35. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the KCSD.

## Technical Terms

36. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

b. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

d. Event Data Recorder (E.D.R.): Sometimes referred to informally as an automotive "black box" (by analogy with the common nickname for flight recorders), is a device installed in some automobiles to record information related to vehicle crashes or accidents, but also records doors locking and unlocking and whether seatbelts are fastened. In the USA EDRs must meet federal standards, as described within the U.S. Code of Federal Regulations

e. In-car entertainment (ICE), or in-vehicle infotainment (IVI): A collection of hardware and software in automobiles that provides audio or video entertainment. In car entertainment originated with car audio systems that consisted of radios and cassette or CD players, and now includes automotive navigation systems, video players, USB and Bluetooth connectivity, Carputers, in-car internet, and WiFi.

f. Telematics system: The car's ability to interact with data located outside of the vehicle (i.e. OnStar, Wi-Fi, GPS)

g. Bluetooth: A wireless technology standard for exchanging data between fixed and mobile devices over short distances using short-wavelength UHF radio waves in the industrial, scientific and medical radio bands, from 2.400 to 2.485 GHz, and

13

building personal area networks (PANs). It was originally conceived as a wireless alternative to RS-232 data cables.

37. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as Internet connection, GPS device, hands free calling, music library, movie player, and video game system. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Specifically, where the Device was prior to the robberies and immediately following the robberies through the GPS; what other personal devices connected via Bluetooth or USB to the Device; contact lists, call logs, and text messages saved to the Device; internet connection history; and significant EDRs.

## ELECTRONIC STORAGE

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools as is the case with a computer hard drive, mass storage device, or cellular telephone.

39. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    e. Also saved on the system are profiles of devices were paired to the Infotainment system. Other devices can be paired via Bluetooth wireless connection or through the use of a USB cable. This pairing of a MP3 player or cellular telephone will leave files on the device similar to an Internet Cache file. This can include SMS text messages, contacts lists and call logs.

    f. Location data including routes, a tracking log, and velocity or travel time can be saved on the vehicle's GPS system. The data stored in the GPS files is anticipated to include more detailed records of locations, specifically those immediately prior to and after the Omni Credit Union and the Chemical Bank robbery. This information can lead to the identification of associates that may have knowledge of the robberies or may have participated with WICKS in those robberies. The Device will have more detailed information than the aftermarket GPS that Car City installed on the vehicle which only captured location information at random intervals.

    g. Vehicle events such as when the doors are locked or unlocked and opened or closed, calling log made through the vehicle when in hands free mode and a cellular telephone is paired with the vehicle, voice commands and recognition, and other events can be stored.

### **FORENSIC EVIDENCE**

40. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes

described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

**NATURE AND MANNER OF REQUESTED EXAMINATION**

41. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

a. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.